SAMUEL R. MAIZEL (Bar No. 189301)
samuel.maizel@dentons.com
TANIA M. MOYRON (Bar No. 235736)
tania.moyron@dentons.com
AHMED ("ANDY") R. JINNAH (Bar No. 297907)
andy.jinnah@dentons.com
DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California. 90017-5704
Telephone: (213) 623-9300
Facsimile: (213) 623-9224

ANDREW T. SOLOMON (*pro hac vice admission pending*)
asolomon@solomoncramer.com
SOLOMON & CRAMER LLP
1441 Broadway, Suite 6026
New York, New York 10018
Telephone: (212) 884-9102
Facsimile: (516) 368-3896

Attorneys for Plaintiff Matthew Pliskin,
as Trustee of the ICPW Nevada Trust

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MATTHEW PLISKIN, AS TRUSTEE OF THE ICPW NEVADA TRUST,<br><br>Plaintiff,<br><br>-against-<br><br>ROBERT GOLDSTEIN and DRG STRATEGIC, LLC d/b/a/ MERIDIAN GLOBAL,<br><br>Defendants. | Case. No.: 2:18-cv-09491<br><br>**COMPLAINT** |

Matthew Pliskin, as Trustee of the ICPW Nevada Trust, for his complaint against Robert Goldstein and DRG Strategic LLC d/b/a Meridian Global, states:

**INTRODUCTION**

1. This action arises out of the collapse of the public company formerly known as Ironclad Performance Wear Corporation, Inc. ("Ironclad"). Defendants aided and abetted three faithless Ironclad officers in breaching their fiduciary duties to the company through a scheme of manipulating the company's financial results to falsely inflate revenues. As a result of the

scheme, Ironclad was forced to disavow its publicly filed financial statements, triggering a default under its loan covenants, which ultimately forced Ironclad into bankruptcy. *See In re. ICPW Liquidation Corporation, a California Corporation*, No. 1:17-bk-12408-MB (Bankr. C.D. Cal. filed Sept. 8, 2017) (the "Bankruptcy Proceeding"). Ironclad's collapse resulted in shareholder damage in excess of $10 million.

2. Defendant Robert Goldstein, acting through his company, Defendant DRG Strategic, LLC d/b/a Meridian Global ("Meridian"), played a key role in the scheme, acting as the counterparty in a number of phony round-trip transactions, which had no purpose other than to fraudulently boost Ironclad's revenues at critical end-of-fiscal-period moments.

## THE PARTIES

3. Plaintiff Matthew Pliskin is the Trustee of the ICPW Nevada Trust (the "Trust"), which exists for the benefit of the former shareholders of Ironclad. The Trust was created pursuant an approved liquidation plan in the Bankruptcy Proceeding. Pliskin is directed and authorized to investigate and bring claims on behalf of the Trust. Pliskin is a citizen of the state of Florida.

4. Defendant DRG Strategic, LLC, d/b/a Meridian Global, is a Texas limited liability company. Meridian has two members, Defendant Robert Goldstein and Deborah Goldstein, both citizens of the state of Texas.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this matter under 28 U.S.C. § 1332 because there is complete diversity of citizenship and the amount in controversy exceeds $75,000.

6. Venue is proper in the Central District of California under 28 U.S.C. § 1391 because all or a substantial part of the events giving rise to this action occurred in the Central District of California.

///

///

///

- 2 -

COMPLAINT

109558834\V-1

**FACTS**

7. Ironclad was founded in 1998 by Ed Jaeger, who pioneered use-specific glove technology for plumbers, masonry workers, demolition workers, electricians, and construction workers. Ironclad stock has been publicly traded since 2006.

8. In 2014, Ironclad hired Jeffrey Cordes as CEO, who then brought on William Aisenberg as CFO and Thomas Felton as Vice President, Supply Chain (collectively, the "Faithless Officers"). All three had previously worked together in senior positions at Walls Industries, another apparel company. By virtue of their positions and their status as agents of Ironclad, the Faithless Officers owed Ironclad fiduciary duties.

9. On information and belief, Defendant Meridian has been in the clothing and textile business since 2006. Its primary business is to contract with factories around the world to manufacture clothing and textile goods, including private label goods, to be supplied to wholesale customers. Meridian's principal is Defendant Goldstein.

10. On information and belief, Defendant Goldstein has known or has been doing business with one or more of the Faithless Officers even before they joined Ironclad in 2014. At all relevant times, he knew that each of them held top officer positions at Ironclad, were employees and agents of Ironclad, and that they owed their employer fiduciary duties.

11. The Faithless Officers' fraudulent revenue scheme at Ironclad began in the fourth quarter of 2015.[1] Throughout that year, and as late as December 2015, CEO Cordes and CFO Aisenberg had been telling Ironclad's Board that the company would achieve substantial revenue growth in 2015 over the prior years. But in the last weeks, the Faithless Officers realized that, far from realizing their revenue improvement projections, Ironclad's revenues were going to be below prior years' performance. It was at this point, that the Faithless Officers began to implement various schemes to inflate sales artificially.

---

[1] For context, Ironclad's sales in 2013 were $24.5 million. In 2014 (the Faithless Officers' first year), it was $24.2 million. Even with the scams perpetrated by the Faithless Officers, Ironclad reported sales in 2015 of $23.5 million.

12. One of those schemes involved Defendants Goldstein and Meridian. As discussed below, for a fee, Defendants Goldstein and Meridian facilitated three end-of-period transactions to falsely boost Ironclad's revenues.

13. In each case, Ironclad "sold" goods to Meridian on the last day of a fiscal reporting period. Then, in the succeeding months, Ironclad purchased the same goods back from "DRG Strategic" at a higher price. The effect of these round-trip transactions was to enable Ironclad to recognize revenue from the sale in one period and then to buy back the same goods (now sometimes slightly modified with a new label or packaging) at an inflated price (which artificially boosted inventory value at Ironclad), without recording a return and without reversing the sale or taking a corresponding loss. Defendants received a share of the markup as payment for facilitating the fraudulent transactions.

14. These fraudulent transactions all occurred at Ironclad's warehouse and logistics operations in Los Angeles County, which were contracted through Advantage Media Services, Inc. ("AMS"), located in Valencia, California.

15. The first "sale" from Ironclad to Meridian orchestrated by the Faithless Officers and the Defendants was on December 31, 2015, for 27,576 pairs of gloves at $15 per pair, for a total of $413,640. The unsigned purchase order ostensibly requested shipment to an address that was, in fact, Defendant Goldstein's luxury residential condominium complex known as "The Residences at the Highland," but the goods never left AMS's facility. The sale was booked as revenue in the fourth quarter of 2015.

16. Had this been a genuine sale, Meridian's payment would have been due 30 days after the sale. But payment was not part of the plan. Instead, to liquidate Meridian's accounts receivable, Defendants "sold" back to Ironclad all 27,576 pairs of gloves (still sitting in AMS's warehouse in California) at a higher price, as if Ironclad were acquiring new inventory. To pay for this "purchase," Ironclad issued credits to Meridian's account.

17. These credits were consummated in three sequential transactions: on February 29, 2016, March 17, 2016, and April 18, 2016, Meridian "sold" back to Ironclad a total of 27,576

pairs of gloves at $16.50 per pair, which was $1.50 per pair higher than the $15 per pair price at which Meridian had "purchased" them. For each transaction, Ironclad issued "credit memos" to Meridian to offset the amount it owed for its own gloves, which it had just repurchased. Because of the markup on the repurchase transactions, Meridian was paid a premium of $41,364 for facilitating the fraudulent transaction. Defendants accepted the premium.

18. The net effect of these round-trip transactions, which Defendants provided substantial assistance in completing, was that Ironclad (1) overstated its revenues and its accounts receivable for 2015 in the amount of $413,640; (2) overstated its inventory value in 2016 by "selling" the 27,576 pairs of gloves to Meridian at a price above cost and then "buying" them back from Meridian for an even higher amount; and (3) paid a $41,364 premium to Defendants for facilitating the false transactions.

19. Having made a profit in the first round-trip transaction, Defendants Goldstein and Meridian knowingly and willingly participated in the Faithless Officers' scheme two more times.

20. The second round-trip transaction was initiated on June 30, 2016 (the last day of the second quarter of that year). On that date, Ironclad generated an invoice for a "sale" to Meridian of 16,766 pairs of gloves for $13.09 per pair, for a total invoice amount of $219,597.84.

21. The third round-trip transaction was initiated on December 30, 2016 (the last business day of the quarter and the year). On that date, Ironclad generated an invoice for a "sale" to Meridian of 95,796 pairs of gloves for prices between $3.43 and $3.73 per pair, for a total invoice amount of $332,445.48.

22. These two "sales" were similar to the first "sale" in several ways. First, the gloves were marked as "will call" and never left AMS's California warehouse. Second, Meridian ultimately "sold" all the gloves back to Ironclad for a premium, which included payoffs to Meridian. To carry out the third "sale," instead of using credit memos, the Faithless Officers and Defendants moved cash:

- December 30, 2016: Ironclad "sells" goods to Meridian and issues an invoice for $332,445.48

- February 20, 2017, DRG "sells" the same goods back to Ironclad and issues an invoice for $339,151.20.
- March 20, 2017, Ironclad wires $339,151.20 to Meridian.
- March 21, 2017, Meridian transfers $332,445.48 by ACH back to Ironclad.
- Meridian keeps the difference ($6,705.72) as a payoff.

23. On information and belief, the Faithless Officers used cash rather than credits for this third transaction to avoid scrutiny by Ironclad's auditors. CFO Aisenberg was overheard explaining to Goldstein how he was to use the money that Ironclad paid him to buy back the goods to pay for what Meridian had purchased on credit.

24. The net effect of these two additional round-trip transactions, which Defendants provided substantial assistance in completing, was that Ironclad (1) overstated its revenues and its accounts receivable for 2016 in the amount of $552,043.32 (2) overstated its inventory value in 2017 by "selling" over one hundred thousand pairs of gloves to Meridian at a price above cost and then buying them back from Meridian for an even higher amount; and (3) paid a $36,063.72 premium to Defendants for facilitating the two false transactions.

## FIRST CAUSE OF ACTION

### (AIDING AND ABETTING BREACH OF FIDUCIARY DUTY)

25. Plaintiff repeats and realleges each and every fact set forth in paragraphs 1 through 24 as if set forth herein.

26. The Faithless Officers were senior executives and officers of Ironclad and, as such, owed a fiduciary duty to Ironclad which required them to put the company's interests above their own personal interests.

27. The Faithless Officers breached their fiduciary duties to Ironclad, including the duties of diligence, loyalty and care. These breaches included, *inter alia*, (a) engaging in illegal acts and manipulations concerning Ironclad's sales, income, and inventory figures; (b) producing records and public filings that included false financial information, artificially inflated to make it appear that the company was performing better than it was; (c) lying to the Board of Directors and

1  omitting material facts; (d) failing to accurately maintain the company's books and records; and
2  (e) grossly mismanaging, *inter alia*, the sales, inventory, and accounting functions at Ironclad.

3  28.  Ironclad was injured as a direct and proximate result of the Faithless Officers'
4  breach of fiduciary duties.

5  29.  At all material times, Defendants had actual knowledge of the Faithless Officers'
6  fiduciary duties to Ironclad.

7  30.  Defendants substantially assisted the Faithless Officers' breach of their fiduciary
8  duty to Ironclad by knowingly and willingly participating in, and profiting from, the "sell-back"
9  schemes.

10  31.  Defendants' substantial assistance in these schemes not only benefited Defendants
11  financially, it also proximately caused financial harm to Ironclad, including but not limited to (a)
12  causing Ironclad to pay fees to Defendants for facilitating the false transactions; and (2) causing
13  Ironclad's publicly filed financials to be erroneous, requiring internal investigation, restatement of
14  the publicly-filed financials, the substantial loss in the value of Ironclad's stock, the losses from
15  the selloff of assets in bankruptcy, and the enormous costs of the bankruptcy itself.

16  32.  The Trust is entitled to receive actual damages incurred as a result of Defendants'
17  aiding and abetting the Faithless Officers' multiple breaches of their fiduciary duties, including,
18  under the "tort of another" doctrine, its legal fees and expenses incurred in investigating the
19  misconduct, restating its financials, and its costs and expenses throughout the bankruptcy process,
20  which total in excess of $4 million.

## SECOND CAUSE OF ACTION
### (UNJUST ENRICHMENT)

23  33.  Plaintiff repeats and realleges each and every fact set forth in paragraphs 1 through
24  24 as if set forth herein.

25  34.  Defendants received a benefit from their participation in the Faithless Officers'
26  scheme at the expense of Ironclad.

27  35.  Defendants' retention of the benefit is unjust.

28

36. The Trust is entitled to recover restitution of any benefit received by Defendants.

**PRAYER FOR RELIEF**

WHEREFORE, on the basis of the foregoing, Plaintiff respectfully requests a judgment or orders against each Defendant as follows:

A. For actual damages to Plaintiff against each Defendant;

B. For restitution to Plaintiff of any amounts that Defendants were unjustly enriched,

C. For reimbursement of legal fees and expenses incurred by Plaintiff under the "tort of another doctrine" for the costs of investigation, restatement, and bankruptcy that resulted from the scheme in an amount to be determined at trial but is believed to be in excess of $4 million;

D. For such other and further relief as the Court may deem just and appropriate.

Dated: November 8, 2018

DENTONS US LLP

By: /s/Ahmed ("Andy") R. Jinnah
Samuel R. Maizel
Tania M. Moyron
Ahmed ("Andy") R. Jinnah

Andrew T. Solomon
(*pro hac vice admission pending*)

*Attorneys for Plaintiff Matthew Pliskin, as Trustee of the ICPW Nevada Trust*